ANNIE DENSON

*vs.*

ALFRED DENSON, ET AL.

*Equity: sales of land; unknown remaindermen; jurisdiction of equity only found in section* 228 *of Article* 16 *of the Code; no authority to reserve part of proceeds for reinvestment and distribution to life tenant.*

A court of equity has no authority or jurisdiction to decree a sale and conveyance of land, to which unborn remaindermen have title, excepting the authority and jurisdiction contained in section 228 of Article 16 of the Code.          p. 363

Under that section, there is no authority in a court of equity, by a decree, to reserve a portion of the proceeds from the prescribed reinvestment, in order that such portion may be distributed at once to a life tenant.          pp. 363-364

But where the life tenant was conducting a profitable business of her own upon the property, and a separate sum was paid to her, for her business and good-will, the proceeds of the sale of such business formed no part of the fund for the benefit of the remaindermen, and to it only the life tenant was entitled.

p. 366

But out of the proceeds of the sale of the property itself the life tenant was not entitled to have any *additional* sum awarded to her specially for her business interests, apart from her interest as life tenant.          p. 366

*Decided February 11th, 1915.*

Appeal from the Circuit Court No. 2 of Baltimore City. (AMBLER, J.)

The facts are stated in the opinion of the Court.

The cause was submitted to BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Wm. B. Smith* and *James G. Phillips,* submitted a brief for the appellant.

*A. Morris Tyson,* submitted a brief for the appellees.

URNER, J., delivered the opinion of the Court.

The will of John Denson, who died in 1907, bequeathed two contiguous leasehold lots of ground, fronting on Bath street and Foundry alley in Baltimore, to his wife, Annie Denson, for life, and after her death to his two brothers, Alfred C. and William J. Denson, but provided that if either of the brothers should die in the lifetime of the widow, without leaving any children, the survivor should be entitled to the property, and if both should die during that period without issue, the widow should become entitled absolutely, and if either or both of the brothers should die in the widow's lifetime leaving children, the share of the deceased parent should go to his children at the widow's death. The testator had conducted a saloon and restaurant in a small building on the property, and after his death the business was continued by his widow. In 1913 the Pennsylvania Railroad Company desired to secure the property, and its representative, Mr. Julian S. Carter, called upon Mrs. Denson and inquired whether a proposition of purchase would be entertained. Mrs. Denson stated that the property belonged to her for life and she did not want it sold at any price because she had a

business and was making a living there, and it would put her to some expense to move from the premises and get the business established at another location. After a number of conversations it was finally agreed that Mrs. Denson should be paid $2,750.00 as a special and separate consideration for her consent to a sale and for the trouble and expense which she would thereby incur, and that the property should be purchased at the price of $3,500.00. It was understood that equity proceedings would be necessary for a sale, and transfer of the title, and a bill was promptly filed by Mrs. Denson for that purpose under section 228 of Article 16 of the Code. The bill alleged that it would be to the advantage of all parties concerned to have the property sold and the proceeds invested for their benefit. The contingent remaindermen now in existence being the two brothers of the testator and their infant children, were made defendants. It was on March 14, 1913, that the agreement with the widow was effected, and the bill was filed the following day. A separate agreement was executed on the 14th, between Mr. Carter and Mr. Thomas C. Ruddell, who was engaged by Mrs. Denson to conduct the proceedings for the sale, and who is designated in the contract as "trustee," by which the property was agreed to be purchased by Mr. Carter for the sum of $3,500.00, subject to ratification by the Court.

On the same day upon which the bill was filed the plaintiff petitioned the Court for an immediate sale upon the allegation that the property could be sold for $3,500.00 to Julian S. Carter, but that he required its possession at once in order that it might be used in connection with the improvements for which he was making the purchase, and that the price offered was much in excess of any that could be realized at public auction, that a sale would be decreed at the final hearing, and that it would be greatly to the advantage of all the parties that an order should be passed immediately appointing a trustee to make the sale at the price and to the purchaser mentioned. In accordance with this peti-

tion, and the Court being satisfied that a sale would eventually be decreed, an order was passed appointing Edward A. O'Mara and Thomas C. Ruddell as trustees to sell the property for not less than the sum proposed. A private sale of the property to Julian S. Carter for $3,500.00 was reported by the trustees on the same day. The sale was finally ratified on June 12, 1913, and on the following day the trustees executed their deed to the Manor Real Estate and Trust Company, an auxiliary of the Pennsylvania Railroad Company, as the assignee of the purchaser.

The separate sum of $2,750.00 agreed to be paid Mrs. Denson was received by her from the same company on September 17, 1913, and she then executed a deed to the company purporting to convey all her interest in the property.

In the meantime a petition had been filed by Mrs. Denson, on June 30th, in which she stated that the property decreed to be sold was improved with a small store building and a stable in the rear, that it was of little value over the ground rent of $33.75 per annum, that the evidence which had been taken in the case showed that the highest estimate placed upon it by competent appraisers was $800.00, that she had occupied the store building for the purposes of a saloon, in which she had built up a large business and had installed expensive bar fixtures, that she consented to file a bill for the immediate sale of the property for the sum of $3,500.00, which was far beyond its value, but was a proper sum in view of the amount of damage which she sustained by the breaking up of her business, and that she believed herself to be entitled, in addition to the value of her life interest, to some compensation for the loss of her business and for the fixtures which she had placed in the store and which had now become useless. An order was passed for the taking of testimony in reference to the subject-matter of the petition. The only witness examined on that subject was Mrs. Denson herself, who testified that she had repaired the buildings and equipped the saloon at a total cost of $1,000.00, and that

her net profits from the business were about $100.00 per week.

A decree passed on September 25, 1913, confirmed the sale previously ordered, and referred the case to the auditor for the preparation of an account. It also provided that the proceeds of sale remaining after the payment of expenses should be held and invested subject to the same limitations as were imposed by the will of John Denson upon the property decreed to be sold. About two weeks later Mrs. Denson filed another petition, which referred to the provision in the decree as to the investment of the fund, and claimed that the petitioner as life tenant was entitled to receive, by way of commutation, a due proportion of the proceeds of sale according to her age and health as disclosed by the testimony. It was prayed that the decree be modified so as to direct such a payment. Upon this petition, and the consent in writing of counsel for the adult defendants, an order was passed changing the decree to the extent of providing that the petitioner be paid the value of her life estate. There was a further agreement by the same counsel, that Mrs. Denson should be allowed in the audit, subject to exceptions, the sum of $500.00, "as compensation for the betterments which she placed upon the property."

By the auditor's report, Mrs. Denson was awarded $500.00 for betterments in accordance with the agreement of counsel just referred to, and $807.52 in lieu of her life estate, being six-fifteenths of the net proceeds of sale, and the residue of the fund was distributed in equal shares to William J. and Alfred C. Denson for life, with remainders as set forth in the will of John Denson, deceased.

Exceptions to the audit were filed by the trustees. They objected to the allowance made to the widow in lieu of her life estate for the reason that she had conveyed, by her quit claim deed of September 17, 1913, all her interest in the property to the Manor Real Estate and Trust Company for the sum of $2,750.00, and they disputed the award of $500.00 for betterments upon the same ground.

At this stage of the proceedings an order was passed by the Court appointing counsel for the guardian *ad litem* of the infant defendants to represent their interests in reference to the questions raised as to the disposition of the funds. A petition was thereupon filed in the name of the guardian *ad litem* praying that the order providing for the commutation of the widow's life estate be rescinded, and exceptions were filed in his behalf to the allowance in the audit of $807.50 for that purpose, and to the item of $500.00 for repairs and fixtures, and also to the distribution made for life to William J. and Alfred C. Denson for the reason that they are not given life estates by the will. These exceptions, moreover, protested against the ratification of any auditor's account in the case until the consideration received by Mrs. Denson from the Manor Real Estate and Trust Company should be brought into Court.

Testimony was taken upon the issue raised by the various exceptions, and upon final hearing a decree was passed requiring Mrs. Denson to bring into Court the sum of $2,750.00 which she had separately received, the theory of this direction being, as stated, that, that the sum mentioned was in reality part of the consideration paid by the purchaser for the property sold in the proceedings. The decree also rescinded the order for the commutation of the widow's life estate, sustained the exceptions to both allowances to her in the audit, and provided that the funds be invested so as to enure to the benefit of the persons and according to the interests designated by the will of the testator. From this decree Mrs. Denson has appealed.

The Court below was clearly right in disallowing the appellant's claim for a commutation of her life estate. The decree of sale was passed in the exercise of jurisdiction conferred by section 228 of Article 16 of the Code, whose terms and purpose render the demand for a present money payment in lieu of the life interest altogether inadmissible. It is provided by that section that: "In all cases when one or more persons

is or are entitled to an estate for life * * * or any other particular, limited or conditional estate in lands, and any person or persons is or are entitled to a remainder or remainders, vested or contingent, * * * or any other interest, vested or contingent, in the same land, on application of any of the parties in interest, a Court of equity may, if all the parties in being are parties to the proceeding, decree a sale or lease thereof, if it shall appear to be advantageous to the parties concerned, and shall direct the investment of the proceeds of sale * * * so as to enure in like manner as by the original grant to the use of the same parties who would be entitled to the land sold or leased, and all such decrees, if all the persons are parties who would be entitled if the contingency had happened at the date of the decree, shall bind all persons, whether in being or not, who claim or may claim any interest in said land under any of the parties * * * or from or under or by the original deed or will by which such particular, limited or conditional estate, with remainders or executory devises, were created."

It was necessary to invoke the jurisdiction thus conferred because the title to the property to be sold was subject to contingent limitations in favor of a class of persons some of whom might come into being after the passage of the decree and at any time prior to the death of the tenant for life. Apart from the provisions we have quoted the Court had no authority to decree a sale and conveyance of the title of unborn remaindermen. *Downin* v. *Sprecher,* 35 Md. 474; *Downes* v. *Long,* 79 Md. 388; *Murphy* v. *Coale,* 107 Md. 209. In extending the scope of equity jurisdiction so as to provide, in proper cases, for the disposition of land having such limitations of title, the Legislature directed in explicit terms that the proceeds of sale shall be invested so as to enure to the benefit of the persons entitled in like manner as provided by the original deed or will. It would be a plain violation of this requirement to reserve a portion of the proceeds of sale from the prescribed re-investment in order that

it' might be distributed at once to the life tenant, and her proposal to that effect, therefore, cannot be entertained.

Our examination of the record has led us to a different conclusion from that indicated by the learned judge below in decreeing that the sum received by the plaintiff from the vendee of the property be paid into Court as part of the purchase price. The evidence is distinct, positive and uncontradicted to the effect that the separate payment to Mrs. Denson was made and accepted as compensation to her for any inconvenience and loss she might sustain in removing from the property and as an inducement to the withdrawal of her objection to the sale. Mr. Carter testified: "When we negotiated for this property we thought Mrs. Denson could prevent the sale of it. The railroad wanted us to close the matter as soon as possible. We recognized the fact that the quickest way to get the sale through was to compensate her to the extent that she thought she should be remunerated for her business." "When we dealt with her she said she wanted so much money for herself outside of what she would get from the trust estate for the reason that she had this business and she lived there and she would have to buy a new business and open up a new business. We agreed to pay her $2,750.00. In order to get her consent to sell the property we thought it necessary to do this." "In other words," as he said, the idea was to "straighten her out and then buy the property afterwards."

The testimony of Mrs. Denson on this point was, in part, as follows: "In the early part of March Mr. Carter came to me and wanted to know whether I wanted to sell my property. I said, 'No,' it did not belong to me; I had a life interest in it. He said to me, if I were to sell it, what would I want for the property? I told him I had not decided to sell it at all. I was making a living there and my business netted me from $100.00 to $125.00 a week, and I did not care to sell at all. He said, 'Suppose we made you a good offer, would you sell?' I told him he would have to give me time to think it over; it was so sudden; so in about a week

he came back, and asked me if I had thought it over. I told him no, not at that time. He said, 'Well, suppose we talk it over and we will make you a good offer to sell.' Will you sell?' I said it would be the breaking up of the business and my home, and it would take quite a while for me to establish myself in another place. * * * So, he offered to give me $2,750.00 for my business, and $3,500.00 for the property. I told him, 'All right, I will be perfectly satisfied to sell it.' So he gave me $2,750.00 for my business interest and good will. * * * He asked me when I could give him possession of the property. I said I would have to look around and locate myself in another place. I could not find a home in the meantime, so I did not break up until the 15th of September, and he told me that as soon as I gave him possession of the property he would give me the money, the $2,750.00 for my business and good will. So, on the 15th of September I moved, and on the 17th I went to the office there and he gave me my money."

The proof in the case shows that when Mr. Ruddell, in the capacity of nominal trustee, contracted for the sale of the property for $3,500.00, he was not aware of the separate arrangement for the payment of $2,750.00 to Mrs. Denson. and that the trustees appointed by the decree were without any knowledge on that subject when they reported the sale for ratification. In the course of the proceedings it was duly proved that the sale of the property for $3,500.00, being four times the value estimated by the witnesses, was advantageous to all the parties interested. The proposal of purchase for that amount was the only one which the trustees received and the Court approved. It was that price which constituted the sole and ample consideration for the contract upon the basis of which this proceeding was instituted and for the consummation of which the preliminary order and final decree of sale were passed. In our opinion there is no adequate reason for now requiring an extension of the scope and terms of the sale reported, beyond the real and original intent of the trustees and the purchaser, so as to make it

include a consideration which it did not contemplate and which rested upon an entirely separate and distinct agreement. While the deed subsequently executed by the plaintiff, at the instance of the purchaser, purported to convey all her interest in the property, such an instrument was neither necessary nor effective to transfer any part of the title, as that had already been conveyed as a whole by the deed of the trustees executed three months previously. The effort of the plaintiff, by her petition, to have the estate pay her for a loss of business as to which she was fully indemnified by her agreement with the purchaser must, of course, be disapproved, but we find no ground for depriving her of money which she has received as the result of an independent arrangement based upon a consideration in which the other parties to the cause were not intended or entitled to share and by the payment of which they have not been prejudiced.

The question as to the disallowance of the claim for repairs or "betterments" was not discussed in the argument on behalf of the appellant. It will be sufficient to state our conclusion, upon the evidence, that the claim was properly refused.

> *Decree affirmed in part and reversed in part, and cause remanded for further proceedings, the appellant to pay one-half the costs of the appeal, and the remainder to be paid out of the funds in the hands of the trustees.*